IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

DAVID JOEL SADDLER,       §
     PLAINTIFF,              §
                             §
VS.                           §      CIVIL ACTION NO. 4:12-CV-447-Y
                             §
CAROLYN W. COLVIN,        §
ACTING COMMISSIONER    §
OF SOCIAL SECURITY,      §
     DEFENDANT.           §

FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE
AND
NOTICE AND ORDER

This case was referred to the United States Magistrate Judge pursuant to the provisions of

Title 28, United States Code, Section 636(b).  The Findings, Conclusions, and Recommendation

of the United States Magistrate Judge are as follows:

FINDINGS AND CONCLUSIONS

I. STATEMENT OF THE CASE

Plaintiff David Joel Saddler ("Saddler") filed this action pursuant to Sections 405(g) and

1383(c)(3) of Title 42 of the United States Code for judicial review of a final decision of the

Commissioner of Social Security denying his claim for supplemental security income ("SSI")

under Title XVI of the Social Security Act ("SSA").  Saddler protectively filed an application for

SSI on June 17, 2009, alleging that his disability began on November 26, 2008.  (Tr. 73, 130–

32.)

After his application for benefits was denied initially and on reconsideration, Saddler

requested a hearing before an administrative law judge ("ALJ").  (Tr. 78–86, 90.)  The ALJ held

a hearing on June 24, 2010.  (Tr. 38.)  Following the hearing, the case was transferred to a new

ALJ, who reviewed all the evidence as well as the audio record of the hearing and issued an

unfavorable decision on December 17, 2010. (Tr. 23–31.)   On April 9, 2012, the Appeals Council denied Saddler's request for review, leaving the ALJ's decision as the final decision of the Commissioner in this case.  (Tr. 7–12.)  Saddler subsequently filed this civil action seeking review of the ALJ's decision.

## II. STANDARD OF REVIEW

SSI benefits are governed by Title XVI, 42 U.S.C. § 1381 *et seq.*, of the SSA.   In addition, numerous regulatory provisions govern SSI benefits.  *See* 20 C.F.R. Pt. 416 (2013). The SSA defines a "disability" as a "medically determinable physical or mental impairment" lasting at least twelve months that prevents the claimant from engaging in "any substantial gainful activity."  42 U.S.C. §§ 423(d), 1382c(a)(3)(A); *see McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999).

To determine whether a claimant is disabled, and thus entitled to benefits, a five-step analysis is employed.  20 C.F.R. § 416.920(a)(4).  First, the claimant must not be presently working at any substantial gainful activity.  *Id.* § 416.920(b).  "Substantial gainful activity" is defined as work activity "that involves doing significant physical or mental activities . . . for pay or profit."  *Id.* § 416.972.  Second, the claimant must have an impairment or combination of impairments that is severe.  *Id.* § 416.920(c); *see also Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000).  Third, disability will be found if the impairment or combination of impairments meets or equals an impairment contained in the Listing of Impairments ("Listing"), 20 C.F.R. Pt. 404, Subpt. P, App. 1.  20 C.F.R. § 416.920(d).  Fourth, if disability cannot be found on the basis of the claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work.  *Id.* § 416.920(f).  And fifth, the impairment must prevent the claimant from doing

any work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* § 416.920(g); *Crowley v. Apfel*, 197 F.3d 194, 197–98 (5th Cir. 1999).

Before moving from the third to the fourth step of the inquiry, the Commissioner assesses the claimant's residual functional capacity ("RFC") to determine the most the claimant can still do notwithstanding his physical and mental limitations.   20 C.F.R.  § 416.920(a)(4).   The claimant's RFC is used at both the fourth and fifth steps of the sequential analysis. *Id.*  At step four, the claimant's RFC is used to determine if the claimant can still do his past relevant work. *Id.* § 416.920(e).  At step five, the claimant's RFC is used to determine whether the claimant can adjust to other types of work. *Id.*  At steps one through four, the burden of proof rests upon the claimant to show that he is disabled. *Crowley*, 197 F.3d at 198.  If the claimant satisfies this responsibility, the burden shifts to the Commissioner at step five to show that there is other gainful employment the claimant is capable of performing despite his existing impairments. *Id.*

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988).  Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).  It is more than a mere scintilla, but less than a preponderance. *Id.*  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.*  This Court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if substantial evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000); *Hollis*, 837 F.2d at 1383.

### III. ISSUE

Saddler presents the following sole issue regarding the denial of his claim for SSI: Did the Commissioner properly evaluate Saddler's residual functional capacity by determining that Saddler did not have a "severe" (vocationally significant) mental impairment? (Pl.'s Br. 1.)

### IV. ALJ DECISION

In his December 17, 2010 decision, the ALJ concluded that Saddler was not disabled within the meaning of the SSA. (Tr. 31.) In making his determination, the ALJ followed the five-step sequential evaluation process. At the first step, the ALJ found that Saddler had not engaged in any substantial gainful activity since November 26, 2008—the alleged onset date of Saddler's disability. (Tr. 24, 30.) At the second step, the ALJ found that Saddler suffered from "chronic low back pain due [to] degenerative joint disease," which he determined was a severe impairment under the SSA. (Tr. 30.) At the third step, the ALJ stated Saddler's severe impairment did not meet or equal the severity of an impairment contained in the Listing. (Tr. 30.)

The ALJ then opined that Saddler retained "the functional capacity to perform the physical exertional requirements of light work" and that he had "no significant nonexertional limitations." (Tr. 31.) Next, at the fourth step, the ALJ found that Saddler was unable to perform his past relevant work as a sheet metal laborer. (Tr. 31.) Finally, at the fifth step, the ALJ applied the medical-vocational guidelines set forth in Appendix 2 of Subpart P of the regulations (the "GRIDS" or "grid rules") to determine at step five that Saddler was not disabled and had not been disabled at any time through the date of the decision. (Tr. 31.)

4

## V.   DISCUSSION

### A.   Did the Commissioner Incorrectly Determine that Saddler Did Not Have a Severe Mental Impairment?

Saddler first argues that the ALJ failed to consider his severe nonexertional mental impairments. (Pl.'s Br. 9.) The ALJ observed that on November 30, 2009, Saddler went to John Peter Smith ("JPS") Hospital for emergency psychiatric services. (Tr. 26, 287–300.) He was "diagnosed with depression, NOS and rule out depression secondary to general medical condition" and was prescribed Celexa and Trazodone. (Tr. 26, 292.) As the ALJ observed, the record contained evidence of no other mental health treatment. (Tr. 28.) At the hearing, the ALJ referred Saddler to undergo a consultative mental health examination, which was performed by Susan Talmage, Ph.D. ("Dr. Talmage") on August 11, 2010. (Tr. 27.)

The ALJ reviewed Dr. Talmage's consultative exam report and noted that Saddler "was deemed a poor informant and extremely tangential" and that Dr. Talmage had difficulty obtaining information from Saddler.[1] (Tr. 27.) Saddler reported to Dr. Talmage that he experienced depressed mood most of the day, that he had "lost interest and goes miserably through the day," and that he had problems concentrating. (Tr. 27.) Dr. Talmage performed mental status testing, which suggested some cognitive impairments. (Tr. 28.) Saddler was diagnosed with bipolar I disorder and borderline intellectual functioning. (Tr. 28.) Dr. Talmage opined that Saddler

> is capable of understanding and remembering simple instructions and carry[ing] out simple instructions, and has mild limitations in the ability to make judgments on simple work-related decisions.  He has moderate limitations in interacting appropriately with the public, supervisors, and co-workers, and responding appropriately to usual work situations and to changes in routine work setting.

(Tr. 28.)

---

[1] Dr. Talmage elaborated, "All information is not included as Mr. Saddler was late to his appointment. Also, Mr. Saddler was extremely tangential and it was difficult to obtain information.  Please interpret this information with caution." (Tr. 394.)

The ALJ stated that he had considered Dr. Talmage's opinion but that he would not give great weight to "this one-time evaluation." (Tr. 28.) The ALJ noted that Dr. Talmage had diagnosed Saddler with borderline intellectual functioning, but Dr. Talmage's mental achievement testing revealed that Saddler scored in the low to below average range. (Tr. 28.) The ALJ also noted that, other than the November 30, 2009 visit to JPS, Saddler had received no other mental heath treatment. (Tr. 28.) Accordingly, the ALJ found that Saddler had no restriction in activities of daily living, no difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation of extended duration. (Tr. 28.) With these findings, the ALJ determined that Saddler's mental impairment was not severe. (Tr. 28.)

Saddler first argues that the ALJ erred by rejecting Dr. Talmage's exam findings. (Pl.'s Br. 10–11.) The regulations require an ALJ to evaluate every medical opinion in the record. 20 C.F.R. § 416.927(c). Unless the ALJ gives a treating doctor's opinion controlling weight, the ALJ must apply the factors listed in section 416.927(c) to determine what weight to give to each medical opinion. *Id.* These factors are (1) whether the source examined the claimant; (2) whether the source treated the claimant, including length of the treatment relationship, frequency of examination, and nature and extent of the treatment relationship; (3) the medical signs and laboratory findings that support the opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or nonspecialist; and (6) any other factor that tends to support or contradict the opinion. 20 C.F.R. § 416.927(c). While the ALJ's decision could have been more clear in delineating these factors, it is evident from the ALJ's discussion that he did consider them.

First, the ALJ recognized the lack of a treating relationship when he noted that Dr. Talmage's opinion was based on a "one-time examination."[2] Next, the ALJ recognized a lack of signs and findings supporting Dr. Talmage's opinion by noting that, although Dr. Talmage had diagnosed Saddler with borderline intellectual functioning, Saddler actually scored from low to below average on the achievement tests that Dr. Talmage had administered. *See id.* § 416.927(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight [the Commissioner] will give that opinion."). Finally, the ALJ recognized a lack of consistency of Dr. Talmage's opinion with the record as a whole by pointing out that Saddler had received no mental health treatment other than the one-time visit to JPS in November 2009. *See id.* § 416.927(c)(4) ( "Generally, the more consistent an opinion is with the record as a whole, the more weight [the Commissioner] will give to that opinion."). And as the ALJ noted in evaluating Saddler's RFC, Saddler testified that he lived with his sister and that he had visitors over to his house on a daily basis. (Tr. 29.)

On the whole, the ALJ's decision shows that he reviewed the evidence relating to Saddler's mental impairment and, as he was required to do, explained his reasoning underlying his decision not to give great weight to the opinion of the consultative examiner, Dr. Talmage. Accordingly, the Court cannot say that no credible evidentiary choices or medical findings support the ALJ's conclusion. *See Boyd*, 239 F.3d at 704; *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995) (stating that the ALJ "is free to reject the opinion of any physician when the evidence supports a contrary conclusion").

---

[2] Saddler points out that he had two visits with Dr. Talmage. (Pl.'s Br. 12.) However, this was due to the fact that he arrived almost an hour late to his appointment and had to return September 13, 2010, to complete his psychological testing. (Tr. 394, 413–16.) Accordingly, the Court finds no special significance in the fact that Dr. Talmage's consultative examination was performed over two sessions.

Next, Saddler argues that the ALJ improperly failed to evaluate his mental impairment of

borderline intellectual functioning under section 12.05 of the Listing. (Pl.'s Br. 11.)  Section

12.05, which deals with mental retardation, states as follows:

> Mental retardation refers to significantly subaverage general intellectual
> functioning with deficits in adaptive functioning initially manifested during the
> developmental period; i.e., the evidence demonstrates or supports onset of the
> impairment before age 22.
>      The required level of severity for this disorder is met when the
> requirements in A, B, C, or D are satisfied.
>      A.      Mental incapacity evidenced by dependence upon others for
> personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow
> directions, such that the use of standardized measures of intellectual functioning is
> precluded;
> OR
>      B.      A valid verbal, performance, or full scale IQ of 59 or less;
> OR
>      C.      A valid verbal, performance, or full scale IQ of 60 through 70 and
> a physical or other mental impairment imposing an additional and significant
> work-related limitation of function;
> OR
>      D.      A valid verbal, performance, or full scale IQ of 60 through 70,
> resulting in at least two of the following:
>      1.      Marked restriction of activities of daily living; or
>      2.      Marked difficulties in maintaining social functioning; or
>      3.      Marked difficulties in maintaining concentration, persistence, or
> pace; or
>      4.      Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Part 404, Subpt. P, App. 1, § 12.05.

The Court finds that, even if the ALJ erred in failing to evaluate Saddler's diagnosed

borderline intellectual functioning under section 12.05, any such error is harmless.  *See Frank v.*

*Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003) (stating that violation of a regulation constitutes

error and establishes a basis for reversal of the agency action and remand unless a reviewing

court finds that the error is harmless).  Harmless error exists when it is inconceivable that a

different administrative conclusion would have been reached absent the error.  *Id.*  Dr. Talmage's

intelligence testing revealed that Saddler had an IQ of 76, so he could not have met any criteria

of section 12.05.  Thus, even if the ALJ had analyzed Saddler's mental impairment under section

8

12.05, the ALJ would have reached the same conclusion that Saddler's borderline intellectual functioning was not a severe impairment. *See id.*

Finally, Saddler argues that the ALJ erred in applying the grid rules to determine at step five that he can perform work that exists in significant numbers in the national economy because he suffers from nonexertional limitations that make the grid rules inapplicable. (Pl.'s Br. 13.)

> [The grid rules] relieve the [Commissioner] of the need to rely on vocational experts by establishing through rulemaking the types and numbers of jobs that exist in the national economy. . . . Where a claimant's qualifications correspond to the job requirements identified by a rule, the guidelines direct a conclusion as to whether work exists that the claimant could perform. If such work exists, the claimant is not considered disabled.

*Heckler v. Campbell,* 461 U.S. 458, 461–62 (1983). If the claimant's impairments are solely exertional or the nonexertional impairments do not sufficiently affect the claimant's RFC, then the Commissioner may rely exclusively on the grid rules to determine whether there is other work in the economy that the claimant can perform. *Newton v. Apfel,* 209 F.3d 448, 458 (5th Cir. 2000). However, "use of the grid rules is only appropriate 'when it is established that the claimant suffers only from exertional impairments, or that the claimant's nonexertional impairments do not significantly affect [her] residual functional capacity.'" *Watson v. Barnhart,* 288 F.3d 212, 216 (5th Cir. 2002) (alteration in original) (quoting *Crowley v. Apfel,* 197 F.3d 194, 199 (5th Cir. 1999)). If the claimant suffers from nonexertional impairments or a combination of exertional and nonexertional impairments, then the Commissioner must rely on a vocational expert to establish that such jobs exist in the economy. *Newton,* 209 F.3d at 458. Accordingly, before applying the grid rules, the ALJ must determine whether a claimant's nonexertional limitations significantly affect the claimant's RFC. *See Newton,* 209 F.3d at 459; *Smith v. Astrue,* No. 3:08-CV-1241-N, 2009 WL 1203407, at *9 (N.D. Tex. May 1, 2009).

Here, the ALJ found that Saddler had the RFC to perform light work and specifically stated that "[t]here are no significant nonexertional limitations." (Tr. 31.) "[T]he ALJ is not

9

required to incorporate limitations in the RFC that he did not find to be supported in the record."

*Walker v. Astrue*, No. 4:10-CV-680-A, 2011 WL 2989947, at *9 (N.D. Tex. June 1, 2011),

*adopted in* 2011 WL 2990691 (N.D. Tex. July 22, 2011). As detailed above, the ALJ's analysis

of the evidence relating to Saddler's mental impairments and rationale for giving little weight to

Dr. Talmage's opinion are supported by credible evidentiary choices among the medical

evidence in the record and demonstrate the existence of substantial evidence supporting the

ALJ's decision. *See Boyd*, 239 F.3d at 704. Thus, because the ALJ found that Saddler had no

nonexertional impairments that affected Saddler's RFC, the ALJ did not err by applying the grid

rules to find that there was other work in the economy that Saddler could perform. *See Newton*,

209 F.3d at 458.

### B.     Did the Appeals Council Err by Failing to Remand for Consideration of Additional Evidence?

Following the ALJ's unfavorable decision on December 17, 2010, Saddler requested that

the Appeals Council review his case, and he submitted new evidence for the Appeals Council to

consider. (Tr. 18.) This new evidence consisted of medical records from North Texas State

Hospital dated March 1 through March 20, 2012. (Tr. 207–36.) After being arrested for theft on

October 7, 2011, Saddler was found to be incompetent to stand trial and, on March 1, 2012, was

committed to North Texas State Hospital for treatment to restore competency. (Tr. 208–09,

228.) The North Texas State Hospital medical records consist of five different evaluations: (1) a

mental status report, (2) a medical history, (3) a physical examination, (4) a psychiatric

evaluation, and (5) a social assessment. (Tr. 208–36.)

On May 5, 2012, Saddler was assessed by Peter G. Fadow, M.D. ("Dr. Fadow"), who

observed that Saddler was "delusional at times," with "some disorganization in [his] thinking"

and poor memory. (Tr. 209.) Dr. Fadow determined that "[t]here has been a major decline in his

functioning, possibly due to psychosis or some other etiology such as polysubstance

dependence." (Tr. 209.) Dr. Fadow diagnosed Saddler with psychotic disorder not otherwise specified. (Tr. 212.) The last medical record in the transcript from North Texas State Hospital, a physician's progress note by Olayemi A. Faniran, M.D. ("Dr. Faniran") dated May 20, 2012, stated that "there has not been any evidence of cognitive deficits. No active psychotic symptoms are evident either." (Tr. 233.)

On April 9, 2012, the Appeals Council denied Saddler's request for review. (Tr. 7–12.) The Appeals Council stated that it had considered the additional medical evidence from North Texas State Hospital. (Tr. 7.) The Appeals Council determined that the new evidence did not affect the ALJ's decision because the ALJ had decided Saddler's case through December 17, 2010, but "[t]his new information is about a later time." (Tr. 7–8.) Saddler argues that the Appeals Council should have remanded his case to the ALJ because the new medical evidence from North Texas State Hospital demonstrated disorganized thinking and poor memory, which was consistent with his condition as it existed during the time period under consideration. (Pl.'s Br. 15.)

The regulations provide a claimant the opportunity to submit new and material evidence to the Appeals Council for consideration when deciding whether to grant a request for review of an ALJ's decision. 20 C.F.R. § 416.1470(b). For new evidence to be considered material, there must exist "the reasonable possibility that it would have changed the outcome of the [Commissioner's] determination." *Latham v. Shalala*, 36 F.3d 482, 483 (5th Cir. 1994). Additionally, to be considered material, the evidence "must relate to the time period for which benefit was denied." *Johnson v. Heckler*, 767 F.2d 180, 183 (5th Cir. 1985). Evidence of a later-acquired disability or a subsequent deterioration of a nondisabling condition is not material. *Id.* Evidence submitted for the first time to the Appeals Council is considered part of the record upon which the Commissioner's final decision is based. *Higginbotham v. Barnhart*, 405 F.3d

332, 337 (5th Cir. 2005). A court considering that final decision should review the record as a whole, including the new evidence, to determine whether the Commissioner's findings are supported by substantial evidence and should remand only if the new evidence dilutes the record to such an extent that the ALJ's decision becomes insufficiently supported. *Higginbotham v. Barnhart*, 163 F. App'x 279, 281–82 (5th Cir. 2006).

The Court recognizes that evidence acquired after the decision to deny benefits is not automatically irrelevant. It may be used to determine the severity of a condition as it previously existed, *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984), or in identifying the onset date of slowly progressive impairments, *Spellman v. Shalala*, 1 F.3d 357, 361 (5th Cir. 1993). But for the new evidence to be used for those purposes, it must apply to the time period for which benefits were denied. *See Schriner v. Comm'r, Soc. Sec. Admin.*, No. 3:08-CV-2042-N, 2010 WL 2941120, at *6 (N.D. Tex. June 22, 2010) (concluding that the Appeals Council failed to properly consider the new opinion of a treating physician because the physician specified that his opinion related to the claimant's impairments and restrictions extending back to the relevant time period for which benefits had been denied), *adopted in* 2010 WL 2944782 (N.D. Tex. July 22, 2010).

Here, however, the new medical records evaluating Saddler's condition in March 2012 do not indicate that they relate to his condition as it existed prior to the date of the ALJ's decision. Before the ALJ's decision, Saddler's diagnoses were depression, bipolar I disorder, and borderline intellectual functioning. The North Texas State Hospital medical records contain a new diagnosis of psychosis, and they specifically state that Saddler had experienced "a major decline in his functioning." (Tr. 209.) Because evidence of a later-acquired disability or a subsequent deterioration of a nondisabling condition is not material, *see Johnson*, 767 F.2d at 183, the Court concludes that the Appeals Council properly determined that Saddler's new

medical evidence did not relate to the time period for which benefit was denied and, thus, did not affect the ALJ's findings. *See id; see also Higginbotham*, 163 F. App'x at 281–82. Therefore, because none of Saddler's arguments establish that the Commissioner failed to apply the correct legal standards or that the Commissioner's decision is unsupported by substantial evidence, remand on Saddler's issue is not required. *See Leggett*, 67 F.3d at 564; *Hollis*, 837 F.2d at 1382.

## RECOMMENDATION

It is recommended that the Commissioner's decision be affirmed.

### NOTICE OF RIGHT TO OBJECT TO PROPOSED FINDINGS, CONCLUSIONS, AND RECOMMENDATION AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions, and recommendation within fourteen (14) days after the party has been served with a copy of this document. The United States District Judge need only make a de novo determination of those portions of the United States Magistrate Judge's proposed findings, conclusions, and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

13

## **ORDER**

Under 28 U.S.C. § 636, it is hereby **ORDERED** that each party is granted until September ___12___, 2013, to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions, and recommendation.  It is further **ORDERED** that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further **ORDERED** that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions, and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED August ___29___, 2013.

JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE